Alicia DeGAETANO, Plaintiff,

v.

SMITH BARNEY, INC. and Frederick Hessler, Defendants.

No. 95 CIV. 1613(DLC).

United States District Court, S.D. New York.

Nov. 5, 1997.

Laura S. Schnell, Anne L. Clark, Vladeck, Waldman, Elias &· Engelhard, P.C., New York, NY, for Plaintiff Alicia DeGaetano.

Jill L. Rosenberg, Lisa K. McClelland, Orrick, Herrington & Sutcliffe L.L.P., New York, NY, for Defendants.

### OPINION and ORDER

COTE, District Judge.

Plaintiff Alicia DeGaetano ("DeGaetano") moves to modify or correct an arbitration award rendered in her favor in an employment discrimination case, seeking specifically to collect attorney's fees that she was denied in that award. DeGaetano contends that because she received an award of $90,355 in the arbitration, thereby attaining "prevailing plaintiff" status, the arbitrator's failure to grant her attorney's fees constituted a manifest disregard of the law under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* For the reasons stated below, DeGaetano's motion is granted.

### BACKGROUND

DeGaetano commenced this action on March 8, 1995, alleging violations of Title VII, the New York State Human Rights Law ("HRL"), New York· State Executive Law § 296 *et seq.*, and the Administrative Code of the City of New York § 8–107 *et seq.*, against her former employer, Smith Barney Shearson, Inc. ("Smith Barney"), and her former supervisor at Smith Barney, Frederick Hessler ("Hessler"); DeGaetano also brought a claim against Hessler alone under the common law of New York for intentional infliction of emotional. distress. In brief, DeGaetano alleged that she had been forced to resign her employment at Smith Barney due to unwelcome sexual advances made toward her by Hessler, and due to Smith Barney's refusal to take any action in response to her complaints about Hessler.

On February 5, 1996, this Court issued an Opinion and Order ("Order"), familiarity with which is assumed, granting the defendants' motion to compel arbitration of DeGaetano's claims; in so doing, the Court enforced the arbitration clause of an agreement entitled "Principles of Employment" that DeGaetano had signed upon joining Smith Barney in July 1993. That agreement, and specifically the arbitration clause, incorporated by reference Smith Barney's "Arbitration Policy," which at the time of DeGaetano's hiring provided in relevant part:

Arbitration under the Policy shall be conducted pursuant to the arbitration rules of the NYSE [New York Stock Exchange]· in effect at the time of the arbitration except as modified by this Arbitration Policy. The rules in effect as of September 1, 1992 are attached hereto. In addition to the NYSE Rules, the following provisions shall apply.... *Each side shall pay its own legal fees and expenses.*[1]

(Emphasis added.) The Principles of Employment contract· advised DeGaetano that the Arbitration Policy and other key documents:

are available for your review prior to your acceptance of employment, if you choose to

---

1. The language of the Arbitration Policy was modified slightly in a 1994 Employee Handbook distributed to all Smith Barney employees, but ·still retained the provision stating that "[e]ach side shall pay its own legal fees and expenses."

review them. You will be asked to acknowledge receiving copies of the current versions of these with your New Hire paperwork when you begin employment. *Remember—it is your responsibility to read and understand these policies and expectations. If you have any questions, now or in the future, please ask.*[2]

(Emphasis in original.)

During the course of the ensuing arbitration, before an Arbitration Panel under the auspices of the New York Stock Exchange, Inc., DeGaetano formally applied for recovery of her attorney's fees. In support of the application, DeGaetano filed a memorandum of law informing the Arbitration Panel of the requirement that prevailing parties be awarded attorney's fees under Section 2000e–5(k) of Title VII, 42 U.S.C. § 2000e–5(k).[3] Citing that statute as well as *Cowan v. Prudential Ins. Co. of America*, 935 F.2d 522, 523–24 (2d Cir.1991), the memorandum stated: "If DeGaetano establishes her claim of sex discrimination, the Panel *must* award her attorneys' fees and costs." (Emphasis added.) In arguing that: Smith Barney's Arbitration Policy was void to the extent that it purported to preclude recovery of attorney's fees, DeGaetano's memorandum further apprised the Arbitration Panel of the Supreme Court's "holding that ... prevailing claimants [are] *entitled* to receive full attorneys' fees even though their recovery was very modest and substantially less that [sic] the attorneys' fees." (Emphasis added.) As additional support for the fee claim, the memorandum asserted with reference to Section 2000e–5(g)(2)(B) of Title VII that:

> [u]nderlining the importance of vindicating the public policy of eradicating discrimination, the Civil Rights Act provides for attorneys' fees if the claimant proves that a discriminatory motive played a part in the decision *even if* the defendant proves that

it would have taken the same action absent the discriminatory motive.

(Emphasis in original.)

The defendants' submission to the Arbitration Panel also conveyed that "a prevailing plaintiff is entitled to costs under Title VII," although, according to the defendants, "the court has discretion as to the amount of fees allowed." The defendants' primary argument, however, was that the Arbitration Panel had no authority to award attorney's fees in the first instance, because DeGaetano's employment agreements (incorporating the Smith Barney Arbitration Policy) expressly precluded such an award.

On March 18, 1997, following ten days of hearings, the Arbitration Panel rendered its decision, which states in its entirety:

> Respondents shall pay to Claimant $90,355 in damages and interest. This award is joint and several. The *Panel does not find that the conduct of Respondents rose to the level contemplated by Title VII and therefore deny the requests for punitive damages and attorney's fees.* Unpaid forum fees of $10,800 are assessed against Respondent Smith Barney.

(Emphasis added.) DeGaetano filed the present motion on June 16, 1997, seeking attorney's fees and costs, or in the alternative, an order modifying or correcting the Panel's decision to provide for such an award.

## STANDARD

The party seeking to vacate or modify an arbitration award bears the burden of proof, and the showing required of that party in order to avoid summary affirmance of the award is high. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997). Although this Court may vacate an

---

**2.** A further provision similarly advised DeGaetano that it was her *"responsibility to read and understand the dispute resolution/arbitration procedures"* that were available for her review. (Emphasis in original.)

**3.** The full text of this subsection, which the parties failed to quote in their submissions to the Arbitration Panel, states:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
>
> 42 U.S.C. § 2000e–5(k) (1994).

award "when the arbitrator[ ] acted in manifest disregard of the law," *id.*, "the reach of the manifest disregard doctrine is 'severely limited.'" *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir.1997) (quoting *Government of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir.1989)). "A district court should not vacate an arbitration award for manifest disregard simply because of 'error or misunderstanding with respect to the law.'" *International Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 85 (2d Cir.1996) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986)). Rather, the term "manifest disregard 'clearly means more'":

> The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.

*DiRussa,* 121 F.3d at 821 (quoting *Bobker,* 808 F.2d at 933). Thus, in order to modify or vacate an award on the ground of manifest disregard, this Court "must find both that (1) the arbitrator[ ] knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator[ ] ... [was] well defined, explicit, and clearly applicable to the case." *Id.* (internal quotations and citations omitted) (second alteration in original).

## DISCUSSION

■ Section 2000e–5(k) of Title VII provides that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee." 42 U.S.C. § 2000e–5(k). Although not couched in mandatory terms, this statute Establishes a presumptive entitlement to an award of attorney's fees for prevailing parties. The Supreme Court has stated in construing the nearly identical general civil rights attorney's fee provision, 42 U.S.C. § 1988,[4] that in order to "ensure effective access to the judicial process for persons with civil rights grievances[,] ... *a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.*" *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (emphasis added) (internal quotations and citations omitted). *See also Lyte v. Sara Lee Corp.,* 950 F.2d 101, 103 (2d Cir.1991) ("While the language of the Title VII fee provision refers to the award as discretionary, a prevailing plaintiff is in fact entitled to fees 'unless special circumstances would render such an award unjust' in light of the congressional goals underlying enforcement of fee awards in civil rights litigation.") (quoting *Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937).

### A. *Manifest Disregard*

■ Notwithstanding the stringent standard for vacating or modifying an arbitration award, the Court concludes that the Arbitration Panel acted in manifest disregard of the law in failing to award attorney's fees to DeGaetano in this case. There was absolutely no showing of "special circumstances" that would render an award of fees unjust.[5] Most important, there is no question that DeGaetano was a prevailing party in this action, given that she won an award equivalent to more than a year's back pay, imposed jointly and severally against Smith Barney and Hessler.[6] The defendants speculate that DeGae-

---

**4.** The pertinent language of the statute provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

**5.** Neither party directly invoked the "special circumstances" doctrine as a justification for denying attorney's fees to DeGaetano despite her position as a prevailing party. The defendants did argue that an award of fees was beyond the authority of the Arbitration Panel because it was expressly precluded by Smith Barney's Arbitra-

tion Policy. Whether or not this consideration would be a proper application of the "special circumstances" exception, the Arbitration Panel plainly did not rely on it in denying fees to DeGaetano. As discussed below, the Panel explained its decision as one based solely on the application of Title VII standards.

**6.** A plaintiff is a "prevailing party" under Title VII when she "succeeds on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing the suit." *Bridges v. Eastman Kodak, Co.,* 102 F.3d 56, 58 (2d

tano did not in fact prevail on her *employment discrimination* claims, but succeeded only on her claim for intentional infliction of emotional distress; but that speculation is clearly wrong because the common law claim was brought only against Hessler. In addition, the parties presented the case to the Arbitration Panel almost exclusively as one under Title VII, and as the defendants acknowledge, the standards for proving employment discrimination are essentially the same under federal, state, and local anti-discrimination statutes. Thus DeGaetano's award—against both the individual and institutional defendants—must have been based on a finding of liability under the employment discrimination statutes,[7] which in these circumstances entitled her to an award of attorney's fees.

The defendants' argument against an award of attorney's fees (assuming one is available) relies on the recent opinion in *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818 (2d Cir.1997). In *Dirussa, id.* at 822–23, the Second Circuit upheld an arbitration panel's refusal to award attorney's fees following arbitration of an action under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, a statute that—unlike Title VII—clearly mandates the awarding of attorney's fees in any judgment for a plaintiff. Under the relevant provision of that statute, "[t]he court ... shall, in addition to any judgment awarded to the plaintiff, ... allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 626(b) (emphasis added). The *DiRussa* court rejected the argument that the denial of attorney's fees constituted manifest disregard of the law under the ADEA based on the following rationale: there was "no persuasive evidence that the arbitrators actually knew of—and intentionally disregarded—the mandatory aspect of the ADEA's fee provision." 121 F.3d at 822. In other words, the plaintiff had "fail[ed] to inform the arbitrators of the rele-

vant legal standard"—including failing to "quote the language of the relevant ADEA section" or communicate to the arbitrators in any fashion "that the ADEA mandated [a fee] award to a prevailing party"—and therefore the court could not "infer that [the arbitrators] consciously disregarded the ADEA's fee provision." *Id.* at 823.

*DiRussa* plainly does not control the outcome here, where the Arbitration Panel declined to make a fee award despite being notified unequivocally by all parties of the governing legal principles granting attorney's fees to prevailing plaintiffs. While the plaintiff in *DiRussa* allowed the arbitrators in that case to believe they had discretion in deciding whether to award attorney's fees, the parties here if anything *overstated* the nature of a prevailing plaintiff's right to fees, indicating that it was mandatory, with the Arbitration Panel retaining discretion only as to the issue of the amount of any award.

The arbitrators' notice and knowledge of the relevant law therefore is not at issue in this case, and it is evident that the Arbitration Panel's error in refusing to award attorney's fees to DeGaetano arose from a different problem. As noted, the decision denying fees states that the Panel "does not find that the conduct of [the defendants] rose to the level contemplated by Title VII and therefore deny the requests for punitive damages and attorney's fees." This ruling is nonsensical inasmuch as the only "level contemplated by Title VII" for an award of attorney's fees—with the exception of the "special circumstances" caveat—is that the plaintiff be a "prevailing party," a point not seriously debatable here with respect to DeGaetano in light of the Panel's decision to award her $90,355. *See supra* at 8–9 & n. 6.

Based on the brief and cryptic text of the arbitral ruling, the most reasonable inference—and also this Court's finding—is that the Arbitration Panel erroneously applied to the decision whether to award DeGaetano

Cir.1996) (internal quotations and citations omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).

7. The defendants also speculate that the Arbitration Panel made an award based solely on equity, and found no violation of the employment dis-

crimination statutes. This analysis is wrong as well; it presumes that the Panel wholly disregarded the law regarding liability and made an award to DeGaetano despite finding no statutory violation by the defendants.

attorney's fees the standard for an award of punitive damages, which the parties described to the Panel as requiring proof that the defendants acted maliciously or with reckless indifference to DeGaetano's rights under federal law. Such a mistake, where the parties have clearly presented the relevant, and very different, standards applicable to the two separate issues, constitutes manifest disregard of the law.[8] The error was "obvious," given the briefing by the parties, and was "capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator," given the prominence and general awareness of the doctrine affording attorney's fees to prevailing plaintiffs. *DiRussa*, 121 F.3d at 821 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986)). The conclusion is therefore unavoidable that the Arbitration Panel "appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it," *id.*, a conclusion sufficient, as an initial matter, to warrant modifying the Arbitration Panel's award so as to provide an award of fees to DeGaetano.[9]

### B. *Public Policy*

Having determined that the denial of attorney's fees constituted manifest disregard of the law under Title VII, the Court must reach the defendants' argument that an award of attorney's fees was barred here in any event by the Smith Barney Arbitration Policy. As noted, the Arbitration Policy in effect during DeGaetano's employment provided that "[e]ach side shall pay its own legal fees and expenses." DeGaetano argues here,

as she did in opposing the defendants' original motion to compel arbitration, that such a provision is void as a matter of public policy.

The Second Circuit recently addressed a similar issue in *Thomas James Assocs. v. Jameson*, 102 F.3d 60 (2d Cir.1996), where a securities broker challenged on public policy grounds a provision of his employment contract that purported to waive his right to arbitrate certain claims. Observing that the "term public policy is obviously a broad one; it embraces a multitude of virtues and sins," the *Jameson* court explained that federal public policy is "typically Found in the Constitution, treaties, federal statutes and regulations, and court cases," and that,

> while violations of public policy must be determined through definite indications in the law of the sovereignty, *courts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society.*

*Id.* at 66 (quoting *Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir.1982)) (emphasis added) (internal quotations omitted). Guided by these principles, the court in *Jameson* declared the contract provision waiving the plaintiff's right to arbitrate "void as against public policy." *Id.* The court's decision was influenced in particular by a "specific indication of federal policy," a 1987 resolution by the National Association of Securities Dealers ("NASD")[10] that prohibited its members from requiring their employees to waive the right to arbitrate disputes. *See id.*

Following the analysis in *Jameson*, the Court finds in this case that the Smith Barney Arbitration Policy—to the extent that it

---

**8.** The defendants argue that the denial of attorney's fees "cannot possibly be in manifest disregard of the law" because the Smith Barney Arbitration Policy expressly precludes such awards, and because—according to the defendants—this Court's February 5, 1996 Order determined the Arbitration Policy to be enforceable. To clarify the point, all that the Court intended by this ruling was that the existence of the express waiver provision did not prevent the merits of DeGaetano's claim from proceeding to arbitration once the Court found an otherwise enforceable arbitration agreement.

**9.** Given the Court's determination that the Arbitration Panel acted with manifest disregard of

the law, it is unnecessary to decide the issue left open in *DiRussa, i.e.,* whether the Court should adopt the alternative standard endorsed by the D.C. Circuit in *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1468–69 (D.C.Cir.1997), that arbitration rulings be given less deference "where arbitrators construe federal statutes rather than decide simply the usual issues in typical commercial or labor disputes." *DiRussa,* 121 F.3d at 821.

**10.** The NASD is a self-regulatory association of securities firms that operates under direct supervision of the Securities and Exchange Commission ("SEC").

prevents prevailing plaintiffs from obtaining an award of attorney's fees in employment discrimination cases—is void as a matter of public policy. The Court's conclusion is based on general principles of well-established federal policy, as well as "specific indication[s]" of relevant industry policy. *Id.*

First, it is beyond question that the fee-shifting provision of Title VII is a critical component of Congress's comprehensive statutory scheme for uncovering, redressing, and deterring unlawful employment discrimination in the American workplace. The Supreme Court has emphasized on numerous occasions that an individual plaintiff pursuing claims under the civil rights laws, including Title VII of the 1964 Act, is "cast ... in the role of 'a "private attorney general," vindicating a policy that Congress considered of the highest priority.'" *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416, 98 S.Ct. 694, 697–98, 54 L.Ed.2d 648 (1978) (attorney's fees under Title VII) (quoting *Newman v. Piggie Park Enters.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (Title II)). *See also Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (42 U.S.C.1988); *Lyte v. Sara Lee Corp.,* 950 F.2d 101, 103–104 (2d Cir.1991) (Title VII). For purposes of effecting these vital interests, the Title VII plaintiff "is the chosen instrument of Congress," a role underscored by the notion that "when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal Law." *Christiansburg,* 434 U.S. at 418, 98 S.Ct. at 699.

The express rationale for awarding fees in the employment litigation context is "to facilitate the bringing of discrimination complaints"; specifically, the "legislative history and purpose of § 706(k)"—Section 2000e–5(k) of Title VII—make "clear that one of Congress' primary purposes in enacting the section was to 'make it easier for a plaintiff of limited means to bring a meritorious suit.'" *New York Gaslight Club, Inc. v. Car-*

ey, 447 U.S. 54, 63, 100 S.Ct. 2024, 2030, 64 L.Ed.2d 723 (1980) (quoting *Christiansburg,* 434 U.S. at 420, 98 S.Ct. at 699–700). But the benefits of awarding attorney's fees to prevailing plaintiffs, and thereby encouraging ameliorative lawsuits, serve broader policy goals. "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone"; rather, "the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future." *City of Riverside v. Rivera,* 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (internal quotations and citations omitted). Consequently,

> [i]f the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers.

*Id.* (citation omitted).[11] It is for these principled as well as pragmatic reasons that, as noted above, a prevailing plaintiff in an action under the civil rights laws—including a Title VII plaintiff—"should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Christiansburg,* 434 U.S. at 416–17, 98 S.Ct. at 698 (quoting *Newman,* 390 U.S. at 402, 88 S.Ct. at 966–67); *see also Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937; *Lyte,* 950 F.2d at 103.

Of course, there is no disputing that the fee action in this case arises against the backdrop of an overarching "liberal federal policy favoring arbitration agreements," *Bird v. Shearson Lehman/American Express, Inc.,* 926 F.2d 116, 119 (2d Cir.1991) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)); *see also Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987); Order at 5–8, nor that, under this controlling doctrine, even statutory claims involving substantial individual

---

11. There is no issue in this case at present concerning the proportionality of any fee award that DeGaetano might receive vis á vis the damages she has already been awarded by the Arbitration Panel. Although the holding of Rivera has been limited in the sense that a prevailing ·plaintiff

awarded only nominal damages is now deemed not necessarily to merit an award of attorney's fees, *see, e.g., Farrar v. Hobby,* 506 U.S. 103, 114–16, 113 S.Ct. 566, 574–76, 121 L.Ed.2d 494 (1992), that issue is not presented here, given DeGaetano's $90,355 award.

rights—such as the Title VII claims at issue here—"may be the subject of an arbitration agreement, enforceable pursuant to" the terms of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq. Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991); *see also* Order at 9–10 (citing cases compelling arbitration of statutory claims). Indeed, this Court made clear in its February 5, 1996 Order that even the critical public policies underlying Title VII were not alone sufficient to require that DeGaetano's claims be heard in a court of law. *Id.* at 9. To the contrary, once "[h]aving made the bargain to arbitrate" by signing express agreements to that effect with Smith Barney, DeGaetano was "held to it" because she was unable to show that "Congress ... inten[ded] to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 13 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354–55, 87 L.Ed.2d 444 (1985)). Accordingly, given the procedural posture of the case prior to the Court's February 5, 1996 Order, the Court granted the defendants' motion to compel arbitration of DeGaetano's claims under Title VII. Order at 19.

Nevertheless, forcing an employee to arbitrate important statutory claims pursuant to a valid employment agreement, and forcing her to do so in a forum or under an agreement that affords her less than the full measure of rights granted by the statute, are two very different things. In this vein, it is evident that the key to the Supreme Court's conclusion in *Gilmer,* that statutory civil rights claims similar to those at issue here could be subjected to arbitration, was the recognition that such a procedure, properly applied, did not prejudice the claimant's vital interests; rather, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbi-

tral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354). *Gilmer* thus made clear the applicable standard for determining whether a statutory claim is "appropriate for arbitration":

> so long as the prospective litigant *effectively* may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.

*Id.* at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359) (emphasis added).

This Court's prior Order relied on the *Gilmer/Mitsubishi* standard in addressing DeGaetano's argument that the unavailability of injunctive relief under the Smith Barney Arbitration Policy precluded arbitration of her claims. *See* Order at 14. Rejecting that argument, the Court concluded that DeGaetano could still "effectively ... vindicate" her Title VII claims through arbitration, even though the arbitral forum might not "afford [her] the full panoply of remedies otherwise available in a court of law." *Id.* (quoting *Gilmer,* 500 U.S. at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359)). That conclusion was based on *Gilmer*'s express discourse on the identical issue (*i.e.,* whether the inability to obtain equitable remedies prevents arbitration), including the Supreme Court's statement that "arbitration agreements will not preclude the EEOC from bringing actions seeking ... equitable relief." [12] *See Gilmer,* 500 U.S. at 32, 111 S.Ct. at 1655; Order at 13. *Gilmer*'s treatment of this issue reinforces that it is the judicial forum, and perhaps specific judicial remedies for which there is an equivalent alternative, that may be waived through a binding arbitration agreement, but not the substantive statutory protections that are the subject of the arbitration.

---

**12.** The *Gilmer* Court made these comments in the course of rejecting the specific arguments raised against arbitration in that case, *e.g.,* that arbitration panels are institutionally biased against plaintiffs, that discovery is more limited in arbitration than in federal court, that arbitrators often issue no written opinion, that arbitration permits no class actions or equitable relief,

etc. *See Gilmer,* 500 U.S. at 30–33, 111 S.Ct. at 1654–56. The Court found all of these contentions to be either unfounded, factually incorrect under the applicable arbitration laws, or—as in the case of the inability to obtain injunctive relief—insufficient to preclude arbitration in light of available alternative measures, such as EEOC actions. *See id.*

The Supreme Court's guidance with respect to injunctive relief does not, however, answer the question whether it is permissible for an arbitration agreement and an arbitral forum to preclude altogether the awarding of attorney's fees to a prevailing Title VII plaintiff. Given the Court's emphatic statement that a statute "continue[s] to serve both its remedial and deterrent function" only when it can be said that a plaintiff seeking redress thereunder "may vindicate [his or her] statutory cause of action in the arbitral forum," *Gilmer*, 500 U.S. at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. at 3359), the answer must be "No." Indeed, the Court has indicated as much, albeit in dictum, in *Mitsubishi*.

Starting from the premise that statutory claims are not *per se* exempt from arbitration agreements, the Court in *Mitsubishi* held that federal antitrust claims could be submitted to international arbitration under a valid choice-of-forum clause because even the unquestioned importance to antitrust enforcement of the Sherman Act's treble-damages provision was not enough to "compel the conclusion that [that remedy] may not be sought outside an American court." 473 U.S. at 635, 105 S.Ct. at 3358. Crucial to the holding in *Mitsubishi* was that the parties had "agreed that the arbitral body [was] to decide a defined set of claims ... *arising from the application of American antitrust law*," and that "the tribunal therefore should be bound to *decide that dispute in accord with the national law giving rise to the claim.*" *Id.* at 636–37, 105 S.Ct. at 3359 (emphasis added). As support, the Court noted that "counsel for Mitsubishi conceded that *American law applied to the antitrust claims*," and that the claims had been "submitted to the arbitration panel in Japan on that basis." *Id.* at 637 n. 19, 105 S.Ct. at 3359 n. 19 (emphasis added). The Court then explained that, as a result, it had no need to consider

> the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action .... we merely note that in the

event the choice-of-forum and choice-of-law clauses operated in tandem as a *prospective waiver of a party's right to pursue statutory remedies* for antitrust violations, *we would have little hesitation in condemning the agreement as against public policy.*

*Id.* (emphasis added).

Although the statement in *Mitsubishi* that a prospective waiver of statutory remedies for antitrust violations would violate public policy is not determinative here (for several reasons),[13] it nonetheless is instructive; at the very least it implies, as one court has noted, that "if any part of a contract ... waives a party's right to collect damages for antitrust violations, the provision is void for public policy reasons." *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir.1995). But the discussion in *Mitsubishi* has also been read more broadly than as simply a protection for the statutory right to treble damages in antitrust actions.

For example, the Second Circuit in *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir.1993), applied the *Mitsubishi* framework in the securities context to ensure that the public policies embodied in American securities laws would be vindicated through the foreign arbitration process to which the parties in that case had agreed. Citing the *Mitsubishi* dictum noted above, the *Roby* court expressed concern that the agreements at issue—which provided for arbitration in England under English law—might operate as a "prospective waiver of the statutory remedies for securities violations, thereby circumventing the strong and expansive public policy in deterring such violations." *Id.* The *Roby* court refused to require that American securities law be applied in the arbitration, but nonetheless did scrutinize the applicable English law to ensure that it permitted effective vindication of the rights that American securities laws are designed to protect. The court concluded, in prose echoing *Mitsubishi*:

---

**13.** In addition to being dictum, the statement was issued in a case ostensibly limited to deciding the enforceability of an international choice-of-forum clause in the antitrust context. Not

surprisingly, efforts by courts and litigants to read too much into the passage have been criticized. *See, e.g., Haynsworth v. The Corporation,* 121 F.3d 956, 968–69 (5th Cir.1997).

if the Roby Names were able to show that available remedies in England [the contractually selected forum] are insufficient to deter British issuers from exploiting American investors through fraud, misrepresentation or inadequate disclosure, *we would not hesitate to condemn the choice of law, forum selection and arbitration clauses as against public policy.*

*Id.* at 1365 (emphasis added). The *Roby* court ultimately declined to rule in the plaintiffs' favor, finding that they did have "remedies under English law adequate not only to vindicate their substantive rights but also to protect the public policies established by the United States securities laws." *Id.* at 1366. At minimum, then, the Second Circuit in *Roby* sought to ensure, on policy grounds, that arbitration effectively preserved the protections and remedies afforded by the statutory cause of action at issue.[14]

Returning to the employment discrimination context, the D.C. Circuit in *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C.Cir.1997), likewise interpreted *Mitsubishi* and *Gilmer* as imposing a broad ban on arbitration agreements that prevent plaintiffs from securing all of the rights and remedies available under a statutory claim. Citing the rule that arbitration agreements must permit "the prospective litigant effectively [to] vindicate [his or her] statutory cause of action in the arbitral forum," *Gilmer*, 500 U.S. at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. at 3359) (second alteration in original), the court in *Cole* observed:

> Obviously, *Gilmer* cannot be read as holding that an arbitration agreement is enforceable no matter what rights it waives or what burdens it imposes.... The beneficiaries of public statutes are entitled to the rights and protections provided by the law.

*Cole*, 105 F.3d at 1482.

Unlike the Smith Barney Arbitration Policy, the arbitration agreement operative in

*Cole* bound the arbitrator "to apply Title VII and other applicable public law, both as to substance and remedy, in accordance with statutory requirements and prevailing judicial interpretation." *Id.* at 1480. Consequently, in explaining why it found the agreement in that case to satisfy "all of the factors addressed in *Gilmer*," the *Cole* court specifically noted, *inter alia*, that "the arbitration arrangement ... provides for all of the types of relief that would otherwise be available in court." *Id.* at 1482. The D.C. Circuit nevertheless did find the arbitration agreement impermissible in one respect: it required the employee to pay all or part of the arbitrator's fees. *Id.* at 1483–84. Reasoning that, "[u]nder *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum," the court concluded that it could uphold the validity of the arbitration agreement only by interpreting it to require that the employer "pay all arbitrators' fees in connection with the resolution of Cole's claims." *Id.* at 1484, 1486.

Still closer to the present issue, other persuasive (though non-binding) authority holds that an arbitration agreement may not require a plaintiff to waive a "statutorily-mandated right to recover reasonable attorney's fees," where the "purpose of attorney's fees is to deter [defendants] from improperly contesting meritorious claims," and this statutory right is deemed "important to the effectuation of the [statute's] policies." *See Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1247, 1248 (9th Cir.) (holding that an arbitration clause compelling a franchisee to surrender important rights guaranteed by the Petroleum Marketing Practices Act, including the right to attorney's fees, contravenes the PMPA), *cert. denied*, —— U.S. ——, 116 S.Ct. 275, 133 L.Ed.2d 195 (1995).

 Based on the foregoing authority, the Court finds the governing law in this case

---

14. While the principal issue in *Roby* concerned the requirement that claims protected by American securities laws be tried under English law and before an English arbitration tribunal, the *Roby* plaintiffs also resisted enforcement of the contractual forum selection clause on the ground that their claim for treble damages under the RICO statute would be lost. The Second Circuit rejected that argument, noting that there were

"adequate potential remedies in England" and "significant disincentives to deter" exploitation of American investors. *Roby*, 996 F.2d at 1366. The court concluded that "[a]lthough the remedies and disincentives might be magnified by the application of RICO, we cannot say that application of English law would subvert the policies underlying that statute." *Id.*

to be as follows: contractual clauses purporting to mandate arbitration of statutory claims as a condition of employment are enforceable only to the extent that the arbitration preserves the substantive protections and remedies afforded by the statute; in other words, only if a plaintiff pursuing claims under the statute "effectively may vindicate [his or her] statutory cause of action in the arbitral forum," *Gilmer*, 500 U.S. at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. at 3359). Pursuant to these principles, the Court concludes that the Smith Barney Arbitration Policy, to the extent that it waived DeGaetano's right to obtain attorney's fees as a prevailing Title VII plaintiff, is void as against public policy. Although the arbitration agreement was valid and knowingly entered into, and thus sufficient to compel arbitration of DeGaetano's claims, *see Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652; Order at 9, 12–13, the agreement denied her an attorney's fee award, one of the principal remedies afforded by Title VII, and one of the chief statutory mechanisms designed to effectuate Congress's policy goals of enforcement and deterrence.[15] Given the Arbitration Panel's decision to award DeGaetano $90,355, thereby conferring upon her prevailing plaintiff status, the Court finds that she is entitled to the reasonable attorney's fees she incurred in achieving that successful result.

In addition to the cases and general federal principles relied upon above, the Court is reassured in this conclusion by several "specific indication[s] of federal policy," *Jameson*, 102 F.3d at 66, which confirm that an arbitration agreement purporting to waive a Title VII plaintiff's right to attorney's fees contravenes public policy. These indications arise from very recent policy statement's by both the EEOC and the NASD, declaring their

formal opposition to, and intention to eliminate, prospective mandatory arbitration of employment discrimination claims as a condition of employment in the securities industry.

First, on July 10, 1997, the EEOC issued a Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment ("Policy Statement"), which reaffirmed the EEOC's position that, notwithstanding *Gilmer*'s general approval of such arrangements, compelled arbitration of discrimination claims is "contrary to the fundamental principles evinced in ... the civil rights laws." *Id.* at *1. Among numerous criticisms levied against arbitration of discrimination claims, the Policy Statement specifically notes the EEOC's past opposition to mandatory arbitration agreements that contain "provisions flagrantly eviscerating core rights and remedies that are available under the civil rights laws," including in particular provisions that "*limit remedies* to 'out-of-pocket' damages ... [or] *deny any award of attorney's fees* to the civil rights claimant, should s/he prevail." *Id.* at *7 & n. 18 (emphasis added). The Policy Statement concludes by reiterating the EEOC's "strong support of voluntary alternative dispute resolution programs that resolve employment discrimination disputes," as long as the employee's decision to arbitrate "is freely made after a dispute has arisen." *Id.* at *19.

Similarly, whether in response to the EEOC's Policy Statement or simply to repeated criticism in recent years, the NASD Board announced on August 7, 1997, that it had voted to modify the standard securities broker registration form so as to eliminate the provision requiring mandatory arbitration of employment discrimination disputes.[16] NASD's decision was formalized in a Proposed Rule Charge, which has since been

---

**15.** Notwithstanding the Court's prior decision to compel arbitration of DeGaetano's claims, this stage of the case is the appropriate one for considering the propriety of the arbitral proceedings and whether the result comports with federal anti-discrimination policy. *See, e.g., George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir.1995) (citing *Mitsubishi* for the proposition that if arbitration goes forward and U.S. statutory rights are not fully recognized, "the aggrieved litigant may request a federal court, at the award-enforcement stage, to determine whether the arbitration award violates public policy").

**16.** *See generally* Darryl Van Duch, *Assault on Mandatory Arbitration: EEOC and NASD Oppose Some Employee Agreements*, Nat'l L.J., August 25, 1997, at B1; Dominic Bencivenga, *NASD Alters the Rules: Employment Discrimination Claims Go to Court*, N.Y.L.J., August 28, 1997, at 5.

submitted to the SEC for that agency's required (and apparently still pending) approval. The proposal would add to Rule 10201 of the NASD Code of Arbitration Procedure a provision stating in pertinent part:

> A claim alleging employment discrimination or sexual harassment in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose.[17]

The Chairman, CEO, and President of NASD, Frank G. Zarb, explained the proposed change as follows:

> for cases that allege a violation of a person's civil rights, employees will have the choice to have their claim heard in court. At the same time, we are absolutely committed to strengthening NASD's arbitration system so that it will continue to be the forum of choice for all employer-employee disputes.[18]

In addition, contemporaneous with NASD's action (and in further support thereof) several members of Congress have introduced legislation that would preclude securities brokerages and employers generally from requiring their employees to agree to arbitrate discrimination complaints as a condition of employment.[19]

The present situation, therefore, is that both the regulatory agency charged with enforcing the nation's anti-discrimination laws and the self-regulatory body established to oversee the securities industry, have determined that mandatory arbitration of employment discrimination claims should be eliminated altogether—the former holding so at least in part based on the historic failure of arbitration to provide plaintiffs their full remedies, including attorney's fees. The recent movement to eliminate compelled arbitration plainly has no direct effect on the already completed arbitration of DeGaetano's claims, but the sentiment behind the drive is transparent: mandatory arbitration of em-

ployment discrimination claims is viewed by the relevant governing entities as inconsistent with, or incapable of fully vindicating, the policies underlying the laws that give rise to such claims.

In this respect, that the EEOC and NASD favor eliminating such arbitration *altogether* strongly suggests that these organizations would want any mandated arbitration that did go forward to provide, at the very least, all of the protections and remedies that are afforded under the anti-discrimination statute at issue. And this desire surely would extend to the attorney's fee provision of Title VII, given its importance to the scheme established by Congress to effectuate the beneficial policy goals of that statute. Any arbitration clause requiring a waiver of that right to fees is therefore incompatible with the present position of both the EEOC and NASD.

In sum, the Court finds on the basis of the aforementioned statutes, cases, and specific indications of federal policy, *Jameson,* 102 F.3d at 66, that the Smith Barney Arbitration Policy—to the extent that it precluded DeGaetano from recovering attorney's fees as a prevailing Title VII plaintiff—"tend[s] to injure the public good or contravene [an] established interest of society," *id.* (citation omitted), namely, the well-settled and well-justified policies underlying the federal employment discrimination laws. The relevant portions of the Arbitration Policy are therefore void as against public policy, and cannot be enforced so as to deprive DeGaetano of her entitlement to a reasonable attorney's fee.

## CONCLUSION

DeGaetano's motion to vacate or modify the Arbitration Panel's award is granted insofar as that award denied her attorney's fees. The damages award to DeGaetano of $90,355 is enforced, and the parties are di-

**17.** *See* NASD Proposed Rule Change Pursuant to Rule 19b–4 of the Securities Exchange Act of 1934, File No. SR–NASD–97–77, October 27, 1997, at *4.

**18.** *NASD Proposes Eliminating Mandatory Arbitration of Employment Discrimination Claims for*

*Registered Brokers,* NASD Press Release, August 7, 1997, Statement of Frank G. Zarb.

**19.** *See* NASD Proposed Rule Change, at *11–*12 & nn. 20, 21; *see also DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 823 n. 1 (2d Cir. 1997).

rected to provide the Court within five days with a briefing schedule for determining the amount of attorney's fees to which DeGaetano is entitled as a prevailing plaintiff.

SO ORDERED.